UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re WESTPOINT STEVENS, INC., et al.,

      Debtors.

-------------------------------------------------------x

CONTRARIAN FUNDS, LLC, et al.,

      Appellants,

    -v-                             No. 05 Civ. 06860 (LTS)

WESTPOINT STEVENS, INC., et al.,

      Appellees.

-------------------------------------------------------x

## OPINION

APPEARANCES:

HENNIGAN, BENNETT & DORMAN LLP
  By: Bruce Bennett, Esq.
      Sidney P. Levinson, Esq.
      Joshua M. Mester, Esq.
601 South Figueroa Street, Suite 3300
Los Angeles, CA 90017

HENNIGAN, BENNETT & DORMAN LLP
  By: A. Brent Truitt, Esq.
245 Park Avenue, Suite 3962
New York, NY 10167

*Attorneys for Appellants and Cross-Appellees Contrarian Funds LLC, Satellite Senior Income Fund, LLC, CP Capital Investments, LLC, Wayland Distressed Opportunities Fund I-B, LLC and Wayland Distressed Opportunities Fund I-C, LLC*

JENKENS & GILCHRIST, A PROFESSIONAL CORPORATION
  By: Gregory G. Hesse, Esq.
1445 Ross Avenue, Suite 3200
Dallas, TX 75202

PITNEY HARDIN LLP
  By: Richard M. Meth, Esq.
      Amish R. Doshi, Esq.
P.O. Box 1945
Morristown, NJ 07962
and
7 Times Square
New York, NY 10036

*Attorneys for Appellant Beal Bank, S.S.B., in its capacity as First Lien Agent and Collateral Trustee*

KRAMER LEVIN NAFTALIS & FRANKEL
LLP
  By: Thomas Moers Mayer, Esq.
      Thomas H. Moreland, Esq.
      Gary M. Becker, Esq.
      Gordon Z. Novod, Esq.
1177 Avenue of the Americas
New York, NY 10036

*Attorneys for Appellee Wilmington Trust
Company, As Agent to the 2nd Lien Lenders*

WEIL, GOTSHAL & MANGES LLP
  By: Michael F. Walsh, Esq.
      John J. Rapisardi, Esq.
      Kathryn L. Turner, Esq.
767 Fifth Avenue
New York, NY 10153

*Attorneys for Appellee Debtors and Debtors in
Possession*

SIMPSON THATCHER & BARTLETT LLP
  By: Mark Thompson, Esq.
      Alice Belisle Eaton, Esq.
425 Lexington Avenue
New York, NY 10017

*Attorneys for Appellee Certain 2nd Lien
Lenders*

SONNENSCHEIN NATH & ROSENTHAL
LLP
  By: Peter D. Wolfson, Esq.
      Martin R. Gold, Esq.
      Jo Christine Reed, Esq.
1221 Avenue of the Americas, 24th Floor
New York, NY 10020

*Attorneys for Appellees and Cross-Appellants
Aretex LLC, WS Textile Co., Inc. and Textile
Co., Inc.*

LAURA TAYLOR SWAIN, United States District Judge

Contrarian Funds, LLC, Satellite Senior Secured Income Fund, LLC, CP Capital Investments, LLC, Wayland Distressed Opportunities Fund I-B, LLC and Wayland Distressed Opportunities Fund 1-C, LLC (collectively, the "Steering Committee") and Beal Bank, S.S.B., in its capacity as First Lien Administrative Agent and Collateral Trustee ("Beal Bank" and, together with the Steering Committee, "Appellants") appeal from certain provisions of the Order Authorizing Sale of Substantially All of the Sellers' Assets Free and Clear of Liens, Claims, Encumbrances and Interests, the Assumption of Certain Liabilities, Approval of Successful Bidder and Certain Related Matters, entered by the United States Bankruptcy Court for the Southern District of New York (Drain, B.J.) on July 8, 2005, as amended by Errata Orders dated July 11, 2005, in the jointly administered Chapter 11 bankruptcy proceedings of WestPoint Stevens Inc. and certain of its affiliates[1] (the "Sale Order").[2] The Sale Order, as its title suggests, authorized the sale under section 363(b) of the Bankruptcy Code, free and clear of liens and other interests, of substantially all of the assets of Debtors-Appellees WestPoint Stevens Inc., WestPoint Stevens Inc. I and WestPoint Stevens Stores, Inc., and of certain trademarks of J.P. Stevens Enterprises, Inc. (these entities are collectively referred to herein as "Debtors" or "Sellers")[3] to Appellees WestPoint International, Inc., and WestPoint Home, Inc. (together, "Purchaser" or "Purchasers") in return for unregistered equity securities ("Parent Shares") and related unregistered subscription rights to acquire such securities of a corporate parent of the Purchaser ("Subscription Rights" and, together with the Parent Shares, the "Securities"), certain cash payments in respect of outstanding financing and expenses of the Debtors, and the assumption of

---

[1]    In re WestPoint Stevens, Inc., et al. , Chapter 11 Case No. 03-13532(RDD) (Bankr. S.D.N.Y.), (Jointly Administered).

[2]    The Sale Order and the Errata Orders may be found in the parties' Joint Appendix ("JA") as items A63 through A65.

[3]    The debtor entities are a textile manufacturer and various of its affiliates.

certain of the Debtors' assets and liabilities. The Sale Order also provided that certain of the Debtors' secured creditors (including Appellants here) would receive replacement liens in the Securities and other proceeds of the purchase and sale transaction, determined the value of the Securities and the secured creditors' claims as of the closing date of the sale transaction, directed the distribution to constituents of the senior secured creditor group of which the Steering Committee member entities are part (the "First Lien Lenders") of a portion of the Securities upon the closing of the sale transaction in full satisfaction of the First Lien Lenders' secured claims, and further directed the distribution of the remainder of the Securities to members of the Debtors' junior secured creditor group (the "Second Lien Lenders") in partial satisfaction of those lenders' claims.

In connection with these distributions, the Sale Order provides for the termination of the secured lenders' liens on the distributed sale proceeds. No Chapter 11 plan of reorganization or liquidation was confirmed before, or after, the entry of the Sale Order, which authorized and directed the consummation of all of the foregoing transactions without the necessity of prior confirmation of a Chapter 11 plan. The Steering Committee and its members, the other First Lien Lenders excluding Appellee Aretex, LLC ("Aretex") and Beal Bank in its representative capacities are referred to collectively in this Opinion as the "Objecting First Lien Lenders."

The Appellant Steering Committee members hold a majority of the First Lien obligations. The Purchaser entities and their parent are affiliates of Aretex and of the investor Carl Icahn. (The Purchasers, their parent, Aretex and Icahn are sometimes referred to herein as the "Aretex/Icahn Group.") Appellee Aretex holds a minority of the First Lien obligations and a majority of the Second Lien obligations. As of the time the Sale Order was entered, the First Lien Lenders had a perfected lien on substantially all of the Debtors' assets, and the Second Lien Lenders had a perfected junior lien on those assets. Pursuant to the Bankruptcy Court's valuation of the transaction

consideration and its analysis of the outstanding liabilities to these two creditor groups, the Sale Order

calls for the proportionate distribution of a total of approximately $489 million of Parent Shares

and/or Subscription Rights among the First Lien Lenders and such a distribution of approximately $95

million of Subscription Rights among the Second Lien Lenders, whose aggregate secured claim is

approximately $167 million.

        Appellants challenge principally the in-kind distribution, claim satisfaction and lien

release provisions of the Sale Order, which effectively convert the Objecting First Lien Lenders' more

than $240 million of secured monetary claims against the Debtors into an illiquid minority equity

interest in the parent of successor entities controlled by Mr. Icahn and his affiliates.  In the auction that

preceded entry of the Sale Order, the Steering Committee, in collaboration with the investor Wilbur

Ross, had been the only other bidder for acquisition of the Debtors' assets and control of the successor

business.

        The Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a)(1), and has

considered carefully all of the parties' papers and arguments in connection with these proceedings.

For the following reasons, the Bankruptcy Court's determination that the Objecting First Lien

Lenders' claims can be satisfied through the in-kind distribution of Securities in the context of the sale

of the Debtors' assets pursuant to section 363(b) of the Bankruptcy Code and certain related

determinations are reversed, certain aspects of the Sale Order are vacated, and this matter is remanded

to the Bankruptcy Court for further proceedings consistent with this Opinion.


## FURTHER BACKGROUND AND PROCEDURAL HISTORY

        The Sale Order, which was entered following an auction of substantially all of the

Debtors' assets pursuant to a bidding procedure put in place by the Bankruptcy Court several months

earlier, was the culmination of a contest for control of what could, for lack of a better term, be characterized as an informally reorganized debtor. The Debtors had entered Chapter 11 approximately two years beforehand and, in that time, had been unable to negotiate arrangements with their creditors that would permit them to confirm a Chapter 11 reorganization or liquidation plan consensually.[4] As of the time of the approval of the Sale Order, the Debtors were in a very precarious financial condition. Indeed, the Bankruptcy Court noted in its June 29, 2005, oral ruling approving the Aretex/Icahn Group's bid and the transaction terms here at issue that the Debtors lacked sufficient cash, or the ability to generate such cash, to retire their debtor-in-possession financing and the secured claims of the First Lien Lenders. (Tr. of June 29, 2005 Bankruptcy Ct. Hr'g, JA item A72 ("6/29 Tr."), at 200.)

Earlier in the year, the Steering Committee, in collaboration with Mr. Ross (this grouping will sometimes be referred to in this opinion as the "Steering Committee/Ross Group"), negotiated a proposed transaction with the Debtors, similar in structure to the transaction approved by the Sale Order, under which substantially all of the Debtors' assets would have been transferred pursuant to Bankruptcy Code section 363(b) free and clear of liens and interests to a Steering Committee/Ross Group affiliate and the Debtors would have received equity in the affiliate in return. Those equity securities would have been distributed in satisfaction of, inter alia, the First Lien Lenders' secured debt. By virtue of the Steering Committee's majority holding of the First Lien Debt

---

[4] Confirmation of a Chapter 11 plan requires, among other things, that at least one class of "impaired" creditors – that is, creditors whose legal, equitable or contractual rights are altered by the plan – accept the plan, and that administrative claims be paid in cash on the effective date of the plan absent consent to different treatment. See 11 U.S.C. §§ 1124(a)(1), 1129(a)(9), 1129(a)(10).

and/or provisions of a certain collateral trust agreement[5] that the Steering Committee contends give it the right to act on behalf of the First Lien Lenders as a group, the Steering Committee would have controlled the new company, which would have carried on the Debtors' business. This Steering Committee/Ross Group transaction was proposed by the Debtors in a motion to the Bankruptcy Court.[6]

The Bankruptcy Court denied the motion for approval of the Steering Committee/Ross Group transaction,[7] but ultimately approved and set in motion an auction procedure in which a similarly-structured Steering Committee/Ross Group bid was the stalking horse.[8]

The Sale Order was entered, over strenuous objections by the Steering Committee and objections by Beal Bank, following a two-month effort to solicit bids for acquisition of the Debtors' assets, an auction in which there were only two bidders – the Steering Committee/Ross Group and the Aretex/Icahn Group –, and a four-day hearing. The Bankruptcy Court found, based on bids tendered at the auction and the evidence presented at the hearing, that the overall value of the Aretex/Icahn

---

[5]  The Second Am. and Restated Collateral Trust Agreement, June 9, 1998, JA item A36, Ex. A. Beal Bank is the current Collateral Trustee under that agreement.

[6]  (See Notice of Hr'g on Mot. for (i) Order Approving Bidding Procedures, Forms of Notice, and Break-Up Fee and Bidding Protections for Stalking Horse Bid and (ii) Order Authorizing the Debtors to Sell Substantially All Their Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, JA item A4.)

[7]  (Order Denying Debtors' Mot. to Approve Bidding Procedures and Related Relief, JA item A19.)

[8]  (See Order Approving Bidding Procedures and Forms of Notice in Connection with the Sale of Substantially All the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, JA item A27.) That Order provided, inter alia, that "nothing in this Order or the Bidding Procedures shall prejudice the rights of parties in interest to raise objections at the Purchaser Selection Hearing including, without limitation, as to credit bidding, assumed liabilities, valuation, factors the Debtors used to evaluate bids, allocation, allocation of value or consideration or otherwise, or to propose an alternative transaction." (Id. at 3-4.)

Group transaction was $703.5 million, that the value of the Parent Shares and Subscription Rights available for distribution to First and Second Lien Lenders was $575.8 million, that the amount of the First Lien Holders' collective allowed secured claim as of June 30, 2005 was $488,371,841.20, and that the value of the sale consideration flowing to the Debtors in the transaction exceeded the First Lien Lenders' aggregate claim by $95 million, warranting distribution of the Subscription Rights remaining after satisfaction of the First Lien Lenders' claims through the in-kind distribution, to the Second Lien Lenders.  (See, e.g., Sale Order ¶¶ Q, S-T.)  The Bankruptcy Court further found that such direct, in-kind distributions were permissible under an Intercreditor Agreement among the Debtors and the First and Second Lien Lenders,[9] and that a distribution to the Second Lien Lenders was necessary by way of adequate protection of their interests.  (Sale Order ¶ R; 6/29 Tr. at 221-22.)

Although the Sale Order contemplated the possibility that the transactions it authorized could be accomplished in connection with a plan of reorganization, it provided that no plan or further order of the Court was required to effect the transactions.  (Sale Order ¶ F.)  The Sale Order thus by its terms permitted consummation of the transactions, including the transfer of substantially all of the Debtors' assets to the Aretex/Icahn affiliates free and clear of liens, the grant of replacement liens to the First and Second Lien Lenders in the Securities to be issued by the Aretex/Icahn affiliated holding company and other sale consideration, and the issuance of illiquid Securities[10] to the Objecting First Lien Lenders, in a quantity valued by the Bankruptcy Court as of the closing date to equal the accrued

---

[9]     The Intercreditor and Lien Subordination Agreement among WestPoint Stevens, Inc., and certain of its subsidiaries, the trustee under the First Lien Lenders' collateral trust agreement and the administrative agent under the Second Lien Lenders' collateral security agreement ("Intercreditor Agreement") can be found at Ex. C to JA item 36.

[10]    The Securities were not expected to be registered as of the time of closing, but both the Aretex/Icahn bid and the Sale Order contemplated that prompt steps would be taken to register them, a process that could take some months.

amount of those lenders' secured claims as of the transaction closing date, in complete satisfaction of

their claims, and termination of the Objecting First Lien Lenders' liens in the replacement collateral,

all without the confirmation of any Chapter 11 plan or any other action of the Court. The Objecting

First Lien Lenders' secured monetary claims against the Debtors would thus be converted into equity

in a new company operating with the Debtors' former assets and controlled by the Steering

Committee's auction rival.

       The Steering Committee moved before the Bankruptcy Court for a stay of the Sale

Order pending appeal. Judge Drain denied that application in an oral decision rendered on July 22,

2005, but agreed to stay the order for a brief period pending a stay application to this Court. (Tr. of

July 22, 2005 Bankruptcy Ct. Hr'g re: Second Lien Agent's Mot. for an Order Dissolving Adequate

Protection Escrow, Objection of Bank of America, N.A., . . . Mot. for Stay Pending Appeal, JA item

A91 ("7/22 Tr."), at 130-31.) The Objecting First Lien Lenders then filed motions in this Court for

expedited consideration of their appeal of the Sale Order and for a stay of the Sale Order pending

appeal. Those matters came on before the undersigned on August 5, 2005. After hearing arguments

of counsel concerning a stipulation resolving the stay application, proposed by the Steering

Committee, Beal Bank, the Purchaser, Aretex and the Debtors, the Court overruled objections by

Second Lien Lenders other than Aretex and the Second Lien Agent (collectively, the "Second Lien

Appellees") to entry of the stipulation, granted a stay consistent with the terms of the stipulation, and

granted the expedited appeal application to the extent of setting a briefing schedule therefor.

       This Stipulation Between Steering Committee of First Lien Lenders, Debtors, Aretex

and Purchasers Regarding Steering Committee's and Beal Bank's Motion for Stay, entered by this

Court on August 5, 2005 in miscellaneous matter No. M47 (the "Stay Order") provided, inter alia, that

the Objecting First Lien Lenders withdrew their application to stay the closing of the sale to Purchaser

of the Debtors' assets and that the distribution of the Subscription Rights allocable to the Second Lien

Lenders under the Sale Order was stayed on the following terms:[11]

> 3 . . . a. The Second Lien Distribution [of Subscription Rights] to the Second Lien Lenders shall be made at the closing, but shall be held in escrow . . . pursuant to an escrow agreement . . . . (Until placed in escrow, the Second Lien Distribution shall be held in escrow by WestPoint International, Inc.).

> b. The escrow agreement will provide that the Second Lien Distribution shall be disbursed to the Second Lien Lenders as provided in the Sale Order on the earlier of (i) October 31, 2005 or (ii) two business days after the District Court issues an order regarding its decision on the appeal of the Sale Order (the 'Escrow Release Date') . . .; provided, however, that if the District Court in its order on the appeal provides that some or all of the subscription rights should be distributed to the First Lien Lenders under the Intercreditor Agreement or otherwise, or remands to the Bankruptcy Court to determine the allocation of Subscription Rights held in escrow, then the Subscription Rights being held in escrow shall be disbursed or further held in escrow in accordance with such order unless such order is stayed by further order of the appropriate Court on application by a party other than the Steering Committee, its members or Beal Bank, in which case the Distribution shall remain in escrow pending further order. If the registration statement [for the Securities] goes effective prior to the Escrow Release Date, the exercise period shall be extended as necessary to provide a full thirty-day exercise period after the Escrow Release Date, but in no event beyond November 30, 2005.

> * * *

> e. In all other respects, the distributions noted above shall be in accordance with the Sale Order and the terms of the Asset Purchase Agreement, including Section 3.3(b) thereof.

> 4. Except as specifically set forth herein, the rights of all parties to this appeal, including Aretex, Purchasers, the Second Lien Lenders, the Second Lien Agent, the Debtors, the First Lien Agent, the Collateral Trustee and the Steering Committee, as to the appeal and all other disputes and matters between them, including without limitation rights under paragraph R of the Sale Order, are expressly preserved and are not affected by this stipulation.

---

[11]     As used in this Opinion, capitalized terms within quotations from other documents have the meanings set forth in the respective documents unless specifically indicated otherwise.

(Stay Order ¶¶ 3-4.[12])  The Aretex/Icahn/WestPoint asset purchase transaction closed on August 8, 2005, following entry of the Stay Order.  The Subscription Rights designated by the Sale Order for distribution to the Second Lien Lenders have been held in escrow since that time pursuant to the Stay Order.  In accordance with the Sale Order and as permitted by the Stay Order, Securities have been distributed to the First Lien Lenders in proportion to their holdings of First Lien debt.

The undersigned accepted the instant appeal as related to the stay application; the appeal was argued on September 20, 2005, and ancillary briefing was completed shortly thereafter. The Court heard further arguments on November 9, 2005.

In addition to the Objecting First Lien Lenders' appeal of the distribution, claim satisfaction and lien termination provisions of the Sale Order, Aretex has cross-appealed on issues relevant to the selection of the winning bid.  As Aretex acknowledges in its cross-appeal papers, the Court need not reach those issues if it does not invalidate the sale of the Debtors' assets to Aretex. This Opinion and its accompanying Order do not invalidate the sale; Aretex's cross-appeal is therefore dismissed.

The Second Lien Appellees have moved to strike Beal Bank's appeal as well as portions of the Steering Committee's papers that proffer information postdating the documents in the Joint Appendix and certain arguments the Second Lien Appellees contend have been waived.  The motion to strike Beal Bank's appeal is denied because, as explained below, Beal Bank adequately preserved its issues for appeal.  The remainder of the motion to strike is also denied.  As explained below, the Court finds that the relevant challenged arguments have not been waived.  Furthermore, the factual information sought to be stricken is not pertinent to the grounds upon which the Court has

---

[12]     The October 31, 2005, date referred to in the above-quoted portion of the Stay Order was extended to November 30, 2005, by Stipulation and Order dated October 21, 2005.

determined this appeal.

DISCUSSION

In its opening brief, which was filed prior to entry of the Stay Order and prior to the closing of the Aretex/Icahn/WestPoint transaction, the Steering Committee characterized the issues presented on appeal as:

> 1.     Whether the Bankruptcy Court erred in concluding that the transfer to the First Lien Lenders of only a portion of the noncash replacement collateral securing the First Lien Indebtedness constitutes full satisfaction and/or adequate protection of the First Lien Indebtedness[;]

> 2.     Whether the Bankruptcy Court erred in concluding that, contrary to the explicit and unambiguous terms of the Intercreditor Agreement, the Second Lien Lenders can nonetheless receive any payment or transfer of collateral even though the First Lien Lenders are not receiving full payment in cash[;]

> 3.     Whether the Bankruptcy Court erred in concluding that the Debtors can, pursuant to sections 363(f)(3) or 363(f)(5) of the Bankruptcy Code, sell the Purchased Assets free and clear of the Interests of the First Lien Collateral Trustee and/or the First Lien Lenders[;]

> 4.     Whether the Bankruptcy Court erred in concluding that the Successful Bid by Icahn was authorized, and higher and better, than the competing credit bids directed by the Steering Committee, even though the Successful Bid did not provide for payment in full and in cash of the First Lien Lenders[; and]

> 5.     Whether the Bankruptcy Court erred in concluding that the Debtors are authorized to transfer the collateral directly to First Lien Lenders, rather than to the First Lien Collateral Trustee in its capacity as the lienholder under the First Lien Collateral Trust Agreement.

(Steering Committee Appellants' Opening Br. at 1-2.)

In the following Discussion the Court will address the standards governing its review of the Bankruptcy Court's determinations, the extent to which certain of the issues designated for appeal have been mooted by the closing of the Aretex/Icahn/WestPoint transaction, whether any of the

arguments that have not been mooted have been waived and, as to the merits of the remaining

appellate issues, whether the distribution of Securities in-kind to Objecting First Lien Creditors in

satisfaction of their claims and the follow-on distribution called for by the Sale Order are authorized

by the relevant contracts among the parties, and whether Sections 363 and/or 105 of the Bankruptcy

Code supplied the Bankruptcy Court with the requisite authority to approve the challenged aspects of

the transaction.  The Discussion will thereafter address the question of available remedies.


Standard of Review

On appeal, the legal determinations of the bankruptcy court are reviewed de novo and

its findings of fact are reviewed under a clearly erroneous standard.  See Consumer News and Bus.

Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.), 980 F.2d 165, 169 (2d Cir.

1992); Able v. Shugrue (In re Ionosphere Clubs, Inc.), 184 B.R. 648, 653 (S.D.N.Y. 1995) and

authorities cited therein.


Mootness

Section 363(m) of the Bankruptcy Code provides that

[t]he reversal or modification on appeal of an authorization under subsection (b) . . . of
this section of a sale . . . of property does not affect the validity of a sale . . . under
such authorization to an entity that purchased . . . such property in good faith, whether
or not such entity knew of the pendency of the appeal, unless such authorization and
such sale or lease were stayed pending appeal.

11 U.S.C.A. § 363(m) (West 2005).  In its Sale Order, the Bankruptcy Court made a specific finding

that "[t]he transactions contemplated by the [Asset Purchase] Agreement are undertaken by the

Purchasing Entities without collusion and in good faith, as that term is used in section 363(m) of the

Bankruptcy Code . . . ."  (Sale Order ¶ 34.)  This finding is not challenged on appeal.  The purchase

and sale transaction closed on August 8, 2005. It appears that all of the unstayed aspects of the transaction – including the transfer free and clear of the purchased assets, the cash infusions, the grant of replacement liens and the distribution of Parent Shares and Subscription Rights to First Lien Lenders – have been effected. In light of the asset transfer, these distributions and the Bankruptcy Court's finding, the third and fourth appellate issues identified in the Steering Committee's opening brief, which call into question the Bankruptcy Court's determinations that the assets could be sold free and clear and that the Aretex/Icahn Group bid was highest and best, are moot.

The Securities allocable to the First Lien Lenders under the Sale Order having been distributed directly to the individual Lenders rather than to the First Lien Collateral Trustee, the fifth appellate issue is moot as well. Indeed, the relief sought by the Objecting First Lien Lenders in respect of the fifth issue – distribution of all of the First Lien Lenders' Securities to the First Lien Collateral Trustee and Steering Committee control of the disposition of all of those Securities – would, as the Bankruptcy Court noted in its June 29, 2005, decision, vitiate the purpose of the Aretex/Icahn Group bid: "After all, if the proceeds could be controlled by the Steering Committee, that would be tantamount to declaring the Steering Committee the winner of the auction. * * * Certainly, that is not something that the Icahn bid contemplates or permits." (6/29 Tr. at 227-28.)

Section 363(m) does not, however, preclude the Court from dealing with aspects of the challenged transaction that were stayed. Here, Aretex, the Debtors, the Steering Committee and Beal Bank voluntarily entered into a stipulation on August 5, 2005, pursuant to which this Court stayed the distribution of any Subscription Rights to Second Lien Lenders and the Objecting First Lien Lenders withdrew with prejudice their application to stay the entire transaction. The stipulation specifically contemplated the potential reallocation of those remaining Securities to First Lien Lenders as a

possible outcome of this appeal.[13]  By thus staying the consummation of the release of collateral

provisions of the Sale Order (including paragraph 6 thereof), it also stayed the claim satisfaction and

lien release provisions of that Order.  Appellants' challenges to those provisions (issues one and two),

accordingly, are not mooted by the closing of the sale transaction, with which Aretex chose to go

forward on August 8, 2005, notwithstanding the entry of the Stay Order and consequent uncertainty as

to the potential outcome of this appeal.[14]

        Nor, in light of the stipulation and Stay Order, are the issues relating to the Objecting

First Lien Lenders' cash satisfaction rights argument equitably moot.  In each of the equitable

mootness cases cited by Appellees, the transactions in question had been completed and there had

been no effort to obtain a stay pending appeal, much less a stay of any aspect of the transaction issued.

See, e.g., Official Comm. of Unsecured Creditors v. Trism, Inc. (In re Trism, Inc.), 328 F.3d 1003 (8th

Cir. 2003); In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000); Official Comm. of Unsecured

Creditors of LTV Aerospace & Def. Co., Inc. v. Official Comm. of Unsecured Creditors of LTV Steel

Co., Inc. (In re Chateaugay Corp.), 988 F.2d 322 (2d Cir. 1993).  Furthermore, although an appeal

---

[13]     The stipulation did not, however, limit this Court's remedial authority to such
         reallocation.  Rather, the provision referencing reallocation limited certain of the
         stipulating parties' ability to move for a further stay in the event of such an order. (See
         Stay Order ¶ 3(b).)

[14]     The Court notes in this connection that, while Aretex's counsel argued on August 5,
         2005, that the stipulation would not ultimately disturb Aretex's rights under the Asset
         Purchase Agreement and the Sale Order to receive specified percentages of the
         escrowed subscription rights (see, e.g., Tr. of Aug. 5, 2005 oral argument, at 35-36),
         the Steering Committee's counsel argued that the stipulation preserved the pre-closing
         status quo in so far as the Objecting First Lien Lenders could still pursue their
         arguments that the non-cash distribution of securities did not constitute satisfaction of
         the underlying debt, that they were, rather, entitled to cash payment on their claim, that
         appellants could still treat the Securities as collateral and that only collateral remaining
         after cash payment of their claim should be distributed to the Second Lien Lenders.
         (See, e.g., id. at 23-24, 27.)

should be dismissed as moot where, even though effective relief could conceivably be fashioned, such relief would be inequitable,[15] the Court finds no such impediment to consideration of the merits of issues one and two here.  The relief sought in connection with the first two appellate issues would not disturb the sale of the Debtors' assets free and clear, nor would it give the Objecting First Lien Lenders control of the successor entities.  While, to the extent Securities may have to be sold in order to effectuate satisfaction of the Objecting First Lien Lenders' claims in accordance with their legal rights, relief might result in the Aretex/Icahn Group's receipt of somewhat less than its anticipated total percentage of the equity of the parent entity, such result is not inequitable as Aretex and its affiliates retain the ability to acquire more equity by purchase and, as previously noted, they chose to close the transaction with the Stay Order in place.  They did so despite the Objecting First Lien Lenders' consistent argument that non cash consideration would be insufficient to satisfy the Debtors' obligations to them.  T his case is thus unlike, for example, In re Chateaugay Corp. where, in the absence of a stay, pension obligations were funded, the transferred money disbursed as benefits and a further agreement contemplating continued pension contributions was approved.  See 988 F.2d at 326.


Waiver

        The Appellee Second Lien Lenders, the Purchasers and Aretex assert that Appellants' arguments concerning the Bankruptcy Court's authority to enter the challenged provisions of the Sale Order were waived below.

        Appellees' waiver argument as to the Steering Committee is two pronged: first, they contend that the Steering Committee has waived any right to object to satisfaction of its claim through an in-kind distribution of equity by reason of its participation in a bidding process premised on an

---

[15]        In re Chateaugay, 988 F.2d at 325.

equity consideration structure; second, they argue that the Steering Committee failed to raise below any argument that the Bankruptcy Court lacked power to approve the claims satisfaction, Securities distribution and lien discharge provisions of the Sale Order and thus cannot pursue that position on appeal. Neither waiver argument has any merit. The Steering Committee's participation in the Debtor's proposed auction process, which contemplated competing bids and specifically preserved all parties' rights to make objections at the Purchaser Selection Hearing,[16] constituted neither explicit nor implicit acquiescence in the terms of competing bid.

A party's willingness voluntarily to negotiate away rights for particular consideration constitutes neither a blanket waiver of those rights nor an agreement to accept different consideration. Here, the Steering Committee was apparently willing to forgo its position that it had rights to collateral security and to be paid in cash in accordance with the governing credit documents in exchange for controlling equity in a successor company.[17] The successful Aretex/Icahn Group bid offered the Steering Committee neither control of the successor company nor a cash payout.

Indeed, the Steering Committee vigorously opposed the only competing bid – that of the Aretex/Icahn Group – on a number of grounds, including arguments that any entity bidding against the Steering Committee/Ross Group proposal was required, by virtue of the credit bid

---

[16] See supra note 8.

[17] The Steering Committee's position in this regard is thus unlike that of Chase National Bank in United States Nat'l Bank in Johnstown v. Chase Nat'l Bank of New York City, 331 U.S. 28 (1947), a case cited by the Appellees in this connection. There, the very arrangement that was being challenged by Chase Bank had been proposed by its own lawyer, and accepted by other creditors, several years before. 331 U.S. at 38-39. Nor is Appellees' reliance on the Second Circuit's decision in In re Millennium Seacarriers, Inc., 419 F.3d 83 (2d Cir. 2005), availing. That case involved issues of subject matter jurisdiction arising from voluntary submission of a maritime matter to a bankruptcy court. Here, the issue is not personal jurisdiction but, rather, the scope of the bankruptcy court's powers to act on matters within its jurisdiction as to particular measures affecting the rights of creditors.

provisions of section 363(k) of the Bankruptcy Code, to bid sufficient cash to pay the First Lien Lenders' allowed secured claims out in full. The Steering Committee also argued that the Objecting First Lien Lenders could not even be forced to take the Securities in satisfaction of their claims in a cramdown Chapter 11 plan confirmation scenario under Bankruptcy Code section 1129.

The Bankruptcy Court's Bidding Procedures Order specifically reserved Appellants' rights to make such arguments,[18] and the Bankruptcy Court found that the First Lien Lenders, First Lien Agent and First Lien Collateral Trustee did not consent to the approval of the Aretex/Icahn Group's bid. (6/29 Tr. at 214; see also Sale Order ¶ Q.) The Bankruptcy Court also recognized explicitly, in connection with the selection of the Aretex/Icahn Group as the winning bidder, that the Steering Committee objected to the in-kind claim satisfaction feature of that bid. ( See 6/29 Tr. at 225.) The Bankruptcy Court's finding that the Objecting First Lien Lenders did not consent to the Aretex/Icahn Group bid structure was neither clearly erroneous as a factual matter nor legally incorrect. The Steering Committee's focus below on sections 363(k) and 1129 is not legally or logically inconsistent with the explicit argument here that the Bankruptcy Court was unauthorized to impose the challenged Sale Order provisions on Objecting First Lien Lenders.

Accordingly, the Steering Committee's participation in the bidding and auction process did not constitute a waiver of its right to argue on appeal that the Sale Order's in-kind distribution, claim satisfaction and lien discharge provisions are unauthorized. Nor, for substantially the same reasons, is the Steering Committee estopped from making such arguments.

Appellees' contention that Beal Bank has, as First Lien Agent and First Lien Collateral Trustee, consented to the in-kind claim satisfaction or waived the arguments at issue here is also rejected. As noted above, the Bankruptcy Court recognized that the First Lien Agent and First Lien

---

[18]     See supra note 8.

Collateral Trustee had not consented to the Aretex/Icahn Group proposal. (See also 6/29 Tr. at 182.) The transcript of the June 29, 2005, Purchaser Selection Hearing, which culminated in the approval of the Aretex/Icahn Group proposal and subsequent entry of the Sale Order, makes it clear that there was substantial confusion regarding the anticipated scope of the Bankruptcy Court's ruling, such that arguments concerning the legal implications of the full scope of the transaction were not completely developed. Although there is a well-recognized prudential rule that arguments not raised below generally will not be considered on appeal, the bar is not absolute and may be overcome when necessary to avoid manifest injustice. Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 527 (2d Cir. 1990). Here, where the issues of First Lien Lenders' rights to preservation of interests in collateral and to cash payment had been argued by the Steering Committee at the Purchaser Selection Hearing before counsel for Beal Bank was called upon to speak, and dismissal of Beal Bank's appeal would deprive Objecting First Lien Lenders that are not Steering Committee members of the opportunity to pursue arguments advanced by the Steering Committee and considered by the Bankruptcy Court in its ruling, the Court finds that the general prudential bar has been overcome.


Challenged Provisions of Sale Order

The Court now turns to the propriety of the in-kind distribution, claim satisfaction and lien termination provisions of the Sale Order as they affect the Objecting First Lien Lenders' interests. The relevant provisions of the Sale Order read in pertinent part as follows.

Paragraph 6 of the Sale Order provides for the transfer of substantially all of the Debtors' assets to the Purchasers free and clear of liens, and for the First and Second Lien Lenders' receipt of a replacement lien in the transaction proceeds:

Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, at the Closing the

> Purchased Assets shall be transferred to the Purchaser free and clear of all Interests of any kind or nature whatsoever, . . . with the exception of the Assumed Liabilities, with the Interests of the First Lien Lenders and Second Lien Lenders attaching to the Sale proceeds, including the Parent Shares and the Subscription Rights, to the same extent, validity, and priority that they attached to the Purchased Assets immediately prior to the Closing.

(Sale Order ¶ 6.)  This section of the Sale Order preserves the First and Second Lien Lenders' liens respective priority status in the replacement property.  Paragraph 6 further provides, however, that the lenders' interests secured by the replacement liens are immediately fixed in and confined to the Securities distributed in connection with the closing:  "All such Interests of any kind or nature whatsoever shall be and shall be deemed to be satisfied at the Closing upon the release . . . of such replacement collateral provided for in section 3.3(c) of the [Asset Purchase] Agreement and paragraphs R and 12 of this Order . . . .  The Securities . . . released . . . are, upon such release, hereby found to be . . . received . . . free and clear of all Interests or any kind or nature whatsoever."  (Id. (emphasis supplied).)  Section 3.3(c) of the Asset Purchase Agreement annexed to the Sale Order calls for the direct issuance of specified quantities and/or percentages of the Securities to First and Second Lien Lenders pursuant to the Bankruptcy Court's valuation determinations.  Paragraph 12 of the Sale Order similarly requires that the property in which the replacement liens were granted be apportioned among and distributed immediately upon the closing to the First and Second Lien Lenders:

> In furtherance of Paragraph 6 hereof, the Purchasing Entities and the Debtors shall cause the release and distribution of the Parent Shares, pro rata, directly to the First Lien Lenders (including Aretex) and the Subscription Rights, pro rata, directly to the First Lien Lenders (including Aretex) and, to the extent applicable, the Second Lien Lenders (including Aretex). . . .

(Id. ¶ 12.)  Paragraph R of the Sale Order includes findings that the sale and the release of Subscription Rights to the Second Lien Lenders are permitted by specified provisions of the Intercreditor Agreement and calls for the issuance of specified quantities of Subscription Rights to the

First and Second Lien Lenders in accordance with section 3.3(c) of the Asset Purchase Agreement, subject to a pre-closing reallocation mechanism that could be invoked under certain circumstances. (Id. ¶ R.)  Paragraphs 7 and 9 of the Sale Order enjoin debt security holders and others from asserting their Interests after the closing against the Purchasing Entities, their property, the Purchased Assets, the Securities or any Person that holds the Securities.

As explained above, the Stay Order operated to delay the full distribution of the sale proceeds, and thus the satisfaction of claims through the in-kind distribution and the related release of lien interests in the replacement collateral.

With this review of the Sale Order provisions as background, the Court now turns to the question of whether the Bankruptcy Court erred in determining that the satisfaction of the Objecting First Lien Lenders' claims through the in-kind distribution, and the distribution to Second Lien Lenders, were permitted under the Intercreditor Agreement.

Intercreditor and First Lien Credit Agreements

The Court begins its examination of the merits of Appellants' challenge to the Sale Order with the Bankruptcy Court's determinations that the distribution of Securities sufficed to satisfy the Debtors' obligations to the First Lien Lenders under the Credit Agreement and that the Credit Agreement and the Intercreditor Agreement authorized distribution of Subscription Rights to the Second Lien Lenders.  This is the appropriate starting point because, if the Bankruptcy Court's determinations were correct, this Court need not reach the question of whether an objecting creditor's cash payment and collateral security rights can be permanently impaired in a Chapter 11 proceeding outside of the context of a confirmed plan.  The Bankruptcy Court's legal determinations on these issues of contract interpretation are reviewed de novo on appeal.

The body of the Sale Order itself addresses only the issue of permissibility of the distribution to the Second Lien Lenders under the provisions of the Intercreditor Agreement. It sets forth findings that the distribution came within that agreement's exceptions, for "any Permitted Mandatory Prepayments," for "adequate protection payments as permitted pursuant to section 2.4(g) hereof," and for payments made under a confirmed plan of reorganization, provided in section 2.13 of that contract, to the general requirement that no payments be made to the Second Lien Lenders "until the First Lien Indebtedness has been repaid in full in cash." (See Sale Order ¶ R); see also Intercreditor Agreement, JA item A36, Ex. C § 2.13.

*Credit Documents - Permitted Mandatory Prepayments*

The Intercreditor Agreement defines "Permitted Mandatory Prepayments" as "any payment upon the Second Lien Indebtedness occurring as a result of the Borrower's sale . . . or other disposition of any of the Collateral . . . to the extent that . . . any net proceeds of such sale, transfer or other disposition remain after application to the First Lien Indebtedness to the extent required by the Senior Credit Agreement." Intercreditor Agreement at 4. The question of whether the First Lien Lenders' Credit Agreement with the Debtors required the application of the Securities to reduce or retire the First Lien Lenders' claim against the Debtors is not addressed in the text of the Sale Order. Rather, the Bankruptcy Court explained its reasoning in this regard in its June 29, 2005, oral decision[19] as follows:

> [T]he second lien lenders have pointed out that Section 3.15 of the first lien loan agreement governs distributions not of cash but 'amounts' when there is an event of default and is prefaced by the introductory clause 'notwithstanding the other provisions of this agreement,' and, therefore, say under the present circumstances where obviously there is a default, and there is no real prepayment under the first lien agreement since it is matured, that provision governs. And that provision on its face does not require all cash payments to the first lienors. And contemplates surplus going

---

[19]     The Sale Order incorporates the oral decision by reference. (Sale Order at 2.)

after the first lienors are satisfied.

> I conclude, particularly given the strict construction applied to subordination agreements under the case law, that that interpretation is reasonable and is [a] . . . basis for paying Aretex and the other second lien holders[] in that there is a surplus after payment of the first lien lenders . . . .

(6/29 Tr. at 232-33.)  Subsection (c) of Section 3.15 of the Credit Agreement, to which the

Bankruptcy Court referred in the above-quoted portion of its June 29th decision, is titled "Allocation

of Payments After Event of Default" and reads in pertinent part as follows:

> Notwithstanding any other provisions of this Credit Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the [First Lien Lenders'] Agent or any [such lender] on account of . . . any . . . amounts outstanding under any of the Credit Documents or in respect of the Collateral shall be paid over or delivered as follows: FIRST, to [the payment of agent and trustee fees and expenses in connection with enforcement of the lenders' rights] . . .; SECOND, to payment of any fees owed to the Agent or the [Collateral] Trustee; THIRD, to [lender out of pocket costs and expenses incurred in enforcing their rights] . . .; FOURTH, to the payment of all [of the borrowers' and guarantors' o]bligations consisting of accrued fees and interest; FIFTH, to the payment of the outstanding principal amount of the [borrowers' and guarantors' o]bligations (including the payment or cash collateralization of all of the outstanding [letter of credit o]bligations; SIXTH, to all other [borrower and guarantor o]bligations . . . and other obligations which shall have become due and payable under the Credit Documents or otherwise and not repaid pursuant to clauses 'FIRST' through 'FIFTH' above; and SEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

Credit Agreement, JA item A36, Ex. B § 3.15(c).  Based on the section's introductory clause, its

references to "amounts" and its provision for payment over of any surplus, the Bankruptcy Court

apparently interpreted this provision of the agreement to override the otherwise applicable cash

payment provision of section 3.15(b) ("Procedure for Payments"), which specifically requires that

"[a]ll payments hereunder shall be made . . . in immediately available funds."  This Court finds the

Bankruptcy Court's interpretation inconsistent with the plain language of Section 3.15 of the Credit

Agreement.

As the Bankruptcy Court noted, section 3.15(c) is operative only upon an event of default. It taxes the imagination to suppose that a sophisticated group of creditors, such as the original bank parties to the Credit Agreement, would enter into an agreement giving them the clear contractual right to cash payments when the <u>borrowers</u> are complying with their obligations under the agreement, but giving the borrowers the unilateral right to substitute property in satisfaction of their payment obligations when the borrowers are in breach of the agreement. Reading the term "amounts" as contemplating the mandatory application of non-cash proceeds is also inconsistent with the internal language of section 3.15(c) which requires, in the case of application to principal payments, the "payment or cash collateralization," through the application of such "amounts," of outstanding drawdowns on letters of credit. <u>See</u> Credit Agreement at 10 (defining "LOC Obligation"); <u>id.</u> Clause "FIFTH," § 3.15(c). Nor is it plausible that the lenders would contemplate deeming the turnover of property to be an appropriate medium for the satisfaction of many of the other obligations prioritized in the payment allocation provisions of section 3.15(c), which contemplate, <u>inter alia</u>, the payment of third-party agent and trustee fees with "amounts" received and the reimbursement, again using such "amounts," of out-of-pocket expenses incurred in enforcing the agreement itself before any application of the "amounts" to outstanding principal and interest.

A reading of section 3.15 of the Credit Agreement in its entirety makes it clear that section 3.15(c), rather than permitting a borrower to force the creditor to take illiquid property in satisfaction of its loan payment obligations after the borrower defaults, simply changes the order in which the required cash payments are to be applied in the event of a default, ensuring that the expenses incurred in collecting the defaulted obligation, outstanding fees and accrued interest obligations, among other items, are covered before the payment is recognized as a reduction of the borrower's debt service obligation under the agreement.

Section 3.15(a) provides that, in the non-default setting, "[E]ach payment on account of an amount due from any [borrower or guarantor] hereunder or under any other Credit Document" is to be made to the lenders' agent "for the <u>pro rata</u> account of the [lenders] entitled to receive such payment as provided herein in the currency in which such amount is denominated and in such funds as are customary at the place and time of payment for the settlement of international payments in such currency." Credit Agreement § 3.15(a) (emphasis supplied). Section 3.15(b) eliminates any possible ambiguity as to whether the borrowers can satisfy their non-defaulted obligations in a medium other than cash, providing that all payments are to be made in "immediately available funds, without setoff, deduction, counterclaim or withholding of any kind." (<u>Id.</u> § 3.15(b).) The section goes on to require the agent receiving the payments to "promptly distribute in same day funds" the respective lenders' shares of the payments. (<u>Id.</u>) It is far more reasonable and logical to read section 3.15(c)'s introductory "Notwithstanding any other provision of this Credit Agreement to the contrary" as overriding the payment application provisions of the two preceding subsections than it is to conclude, as did the Bankruptcy Court, that the bank lenders had agreed to accept payments in the form of illiquid property at the option of a defaulting borrower.

This Court's conclusion as to the proper interpretation of section 3.15 is reinforced by the provisions of the Credit Agreement defining the terms of the types of extension of credit contemplated thereby, which require that the "Revolving Loans", "Competitive Loans" and "Foreign Currency Loans" issued thereunder be evidenced by promissory notes substantially in the forms specified in exhibits to the agreement. Each of the form notes provides for payment "in immediately available funds." <u>See</u> Credit Agreement §§ 2.1(e), 2.2(i), 2.3(e); <u>see also</u> <u>id.</u> Exs. 2.1(e), 2.3(e). The Letter of Credit Subfacility section of the Credit Agreement provides for the funding of letter of credit drawdowns through Revolving Loan advances, and for the borrower's reimbursement of the lender

"in same day funds." Id. § 2.4(d). As the Permitted Mandatory Prepayments provision of the Intercreditor Agreement nowhere purports to override the payment provisions of the Credit Agreement, it is insufficient to authorize the Sale Order's provisions for the satisfaction and release of the Objecting First Lien Lenders' claims and liens, and the distribution of Securities to the Second Lien Lenders.

*Credit Documents - Adequate Protection*

The "adequate protection" clause of the subordinated payment exception provision of the Intercreditor Agreement is similarly ineffective to supply the necessary authority. Section 2.13 of the Intercreditor Agreement permits payments to the Second Lien Lenders of "adequate protection payments as permitted pursuant to section 2.4(g) hereof" prior to full cash payment of the Debtors' obligations to the First Lien Lenders. Intercreditor Agreement § 2.13. Section 2.4(g) of the Intercreditor Agreement generally permits the Second Lien Lenders to assert their entitlement "to adequate protection [of their interests in the Collateral] in accordance with sections 361 through 364 of the Bankruptcy Code." Id. § 2.4(g). In its June 29, 2005, oral decision, the Bankruptcy Court explained succinctly its invocation of this provision: "I believe that not permitting distribution in kind here would render the debt without adequate protection." (6/29 Tr. at 230.) The challenged provisions of the Sale Order are, however, beyond the scope of the adequate protection authority provided to bankruptcy courts by the cited Bankruptcy Code provisions.

Because the contractual provision at issue operates by reference to statutory powers, resolution of the question of whether it provides sufficient authority turns on the scope of the statutory powers. Sections 362, 363 and 364 of the Bankruptcy Code provide for the grant of adequate protection to a secured creditor in the context, respectively, of the effect of the automatic stay, transactions out of the ordinary course of business involving the debtor's assets, and in connection

with post-petition borrowing affecting the priority of a secured creditor's lien. Section 361 defines the purpose of adequate protection and the means by which it may be supplied, providing that such protection is of "an interest of an entity in [the debtor's] property" to the extent the automatic stay, or a transaction contemplated by section 363 or 364, "results in a decrease in the value of such entity's interest in such property." 11 U.S.C.A. § 361(2) (West 2005). Such protection may be supplied by means of cash payments, replacement liens, and/or "such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's <u>interest in such property</u>." <u>Id.</u> § 361(3) (emphasis supplied); <u>see also</u> <u>Collier's on Bankruptcy</u> ¶¶ 361.02[2], [3] (15th ed. rev. 2005) (creditor's right is to protection against decline in value of collateral securing claim).

Prior to the closing of the transactions at issue here the First and Second Lien Lenders' claims were secured, respectively, by perfected senior and junior liens on substantially all of the Debtors' assets. In the first stage of the transactions authorized by the Sale Order, the Bankruptcy Court granted the First and Second Lien Lenders replacement liens in the proceeds (including the Securities) of the sale of those assets. The replacement lien grant was squarely within the letter and purpose of sections 361 and 363(e) of the Bankruptcy Code,[20] in that the value of these secured lenders' interests in the pre-transaction collateral was reduced to zero by the sale of that collateral free and clear of their interests. The Sale Order provides that the replacement liens are granted to the same extent, validity, and priority as the original liens, thus leaving undisturbed the lenders' respective contractual security interests and other rights except to the extent the underlying collateral was substituted as expressly permitted by the statute. Indeed, the Bankruptcy Court's reference during the

---

[20] Bankruptcy Code section 363(e) provides in pertinent part that, "on request of an entity that has an interest in property . . . sold . . . by the trustee, the court . . . shall prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest." 11 U.S.C.A. § 363(e) (West 2005). In a Chapter 11 case, the debtor in possession has the powers of a trustee. <u>Id.</u> §1107(a).

June 29th proceeding to adequate protection of the First Lien Lenders by an "equity cushion" is consistent with the statutory scheme in the context of the replacement lien phase of the transaction and the court's valuations of the securities.[21]

The Bankruptcy Court also, however, characterized the distribution, claim satisfaction and lien termination features of the Sale Order as species of adequate protection: paragraph Q of the Sale Order includes a finding that the "release of the replacement collateral to the First Lien Lenders pursuant to paragraphs R, 6, and 12 of this Order hereof [sic] shall adequately protect them and satisfy their secured claim as of Closing."  (Sale Order ¶ Q.)  The court also found that the distribution of Subscription Rights to the Second Lien Lenders was permissible under the adequate protection provision of the Intercreditor Agreement (Id. ¶ R), and commented on the record of the June 29th hearing that "the alternative to permitting this sale, in my mind, would leave not only the second lien lenders, but also the first lien lenders without adequate protection, that is in severe jeopardy of receiving a seriously reduced recovery."  (6/29 Tr. at 221.)  The invocation of the concept of adequate protection with respect to this latter phase of the transaction is, however, unavailing.

The Bankruptcy Court made no finding that any decrease in the value of the lenders' interests in the replacement collateral would result from the Debtors' retention of the replacement collateral pending confirmation of a plan or other appropriate conclusion of the bankruptcy proceedings.  The need for another adequate protection mechanism following the grant of the replacement lien is thus less than clear.  Indeed, the concept of adequate protection of a creditor's interest in the debtor's interest in property is rather anomalous where the debtor's interest in the property is being eliminated by way of provision of the "adequate protection."  Most fundamentally,

---

[21]     (See 6/29 Tr. at 226.)  The term "equity cushion" generally refers to the excess in value of collateral over the amount of a creditor's secured claim.  See  Collier's on Bankruptcy ¶ 361.02[2][a] (15th ed. rev. 2005).

the second phase of the transactions contemplated by the Sale Order involves, as explained above, the

permanent impairment of the Objecting First Lien Lenders' rights to cash payment and to a collateral

security interest in the Debtors' assets pending realization of their contractual rights. Nothing in the

language of section 361 of the Bankruptcy Code authorizes such impairment of a creditor's rights in

order to provide adequate protection to that creditor, much less to a junior creditor as was done here.[22]

      The Bankruptcy Court pointed to no authority, nor has this Court despite the extensive

research efforts of counsel and the undersigned's own chambers found any, standing for the

proposition that an action in permanent derogation of a senior creditor's contractual rights can be

forced upon that creditor for the purpose of providing "adequate protection" to a junior creditor.

Indeed, it could be argued that, given the Bankruptcy Court's view that the only viable alternative

transactions would have left the Second Lien Lenders with nothing, the value of those junior lenders'

interest in the Debtors' transferred property as of the time the Sale Order was being considered was

something close to zero.[23]

---

[22]    Appellees' argument that the in-kind distribution in satisfaction of the Objecting First Lien Lenders' claim was authorized by the "indubitable equivalence" provision of section 361 is unfounded. Section 361 authorizes adequate protection by way of relief that will "result in the realization . . . of the indubitable equivalent of [the affected creditor's] interest in [the debtor's] property." 11 U.S.C.A. § 361(3) (West 2005) (emphasis supplied). This provision, like the other subsections of section 361, deals with the preservation of the value of a security interest and does not empower the bankruptcy court to resolve a creditor's claim. While Chapter 11 of the Bankruptcy Code does permit the court, in certain circumstances, to require an impaired, objecting creditor to accept provision for realization of the indubitable equivalent of a claim , it does so only in the context of the confirmation of a plan. See id. § 1129(b)(2)(A)(iii).

[23]    The Bankruptcy Court itself made something akin to this point in the portion of its June 29, 2005, oral decision addressing the Steering Committee's argument that the distribution of a portion of the Securities could not be found to constitute the indubitable equivalent of the First Lien Lenders' claims for cramdown purposes under section 1129(b)(2) of the Code in a plan confirmation context:

        [O]ne has to examine carefully the wonderful phrase 'indubitable equivalent'

Taken to its logical extreme, the Bankruptcy Court's notion of adequate protection would allow a powerful creditor and a debtor anxious to achieve some value for its favored constituencies to run roughshod over disfavored creditors' rights, so long as a section 363(b) asset sale transaction could be defended as an exercise of reasonable business judgment in the context of dire economic circumstances. No such expansive interpretation of the Bankruptcy Code's adequate protection provisions is supportable, particularly in light of the fact that the Bankruptcy Code provisions specifically providing for impairment of objecting creditors' rights – the plan confirmation provisions of Chapter 11 – also provide for enfranchisement and procedural and substantive protections for adversely affected creditors.

The Court therefore concludes that the imposition of the distribution, claim satisfaction and lien elimination provisions of the Sale Order on the Objecting First Lien Lenders was not authorized by the adequate protection provisions of the Bankruptcy Code or the adequate protection exception to section 2.13 of the Intercreditor Agreement.

Nor did the Intercreditor Agreement's exception for "any payments or other distributions made or provided . . . under a confirmed plan of reorganization for the Borrower" suffice to sanction the challenged Sale Order provisions. The Sale Order authorized consummation of all of the aspects of the transactions without confirmation of a plan, and no plan was confirmed prior to the closing of the sale or thereafter.

Since the challenged actions were inconsistent with the terms of the contracts relied

---

to determine whether in fact such a distribution would be barred. * * * [O]ne has to ask what is today's collateral, in order to determine whether the equivalent is something doubtful or not in comparison. Based on my understanding on this record, today's collateral, before the sale, is quite doubtful.

(6/29 Tr. at 223.)

upon by the Bankruptcy Court, the next phase of the inquiry must focus on whether the challenged

provisions were authorized by the Bankruptcy Code itself.


Bankruptcy Code Sections 363 and 105

The Bankruptcy Court's Sale Order relies in pertinent part on sections 105 and 363 of

the Bankruptcy Code[24] as authority for approval of the transaction.  The Bankruptcy Court's legal

conclusions that the Objecting First Lien Lenders' claims could be satisfied through the in-kind

distribution of Securities, and their security interests in the remainder of the collateral terminated, in

the context of this section 363(b) sale, are reviewed de novo.

*Bankruptcy Code Section 363*

Section 363(b) of the Bankruptcy Code provides that, after notice and a hearing, the

trustee (or debtor in possession in a Chapter 11 case) may sell property of the bankruptcy estate other

than in the ordinary course of business.  11 U.S.C. § 363(b); see also id. § 1107(a) (debtor in

possession in Chapter 11 case has rights, and performs functions and duties, of a trustee).  A court's

power to approve such a transaction is subject to the general requirement that the court expressly find

from evidence presented to it that there is a good business reason to grant the application.  Comm. of

Equity Sec. Holders v. Lionel Corp. (In re the Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

Here, the Bankruptcy Court found that the Lionel standard had been met; that determination is not

challenged on this appeal.  Where, as here, a sale is to be free and clear of existing liens and interests

other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must

also be met.  The Bankruptcy Court found, in its Sale Order, that the criteria of subsections 363(f)(3)

---

[24]     (See Sale Order ¶ D.)  The Sale Order also cites Bankruptcy Code section 365 in connection with its provisions, not here relevant, for assumption of certain of the Debtors' contracts by the successor entity.  ( See, e.g. , id. ¶ 19.)

and (5) were met as to the Objecting First Lien Lenders.  As explained above, the appeal of those determinations is moot.

As also explained above, the Sale Order sets out a two-step structure for consummation of the relevant aspects of the transaction.  Judge Drain contemplated, however, that the two steps would constitute a simultaneous integrated transaction.  As he explained on the record: "I'll tell you what I contemplated was that it could all happen at the closing, i.e., although it might be a two step process, it can only be metaphysically a two step process."  (7/22 Tr. at 9.)

The first aspect of the transaction is clearly within the scope of the authority granted to the bankruptcy court by section 363 of the Bankruptcy Code; as outlined above, the Bankruptcy Court made the findings required under section 363(f) to authorize a sale free and clear of interests, and the grant of a replacement lien to affected creditors is specifically authorized by section 363(e) of the Code.  As previously explained, the provision for claim satisfaction through the in-kind distribution is, however, inconsistent with the Objecting First Lien Lenders' contractual rights and is outside the scope of the Bankruptcy Court's power to provide adequate protection to these secured lenders.[25]

Neither the Sale Order nor the Court's June 29, 2005, oral decision regarding the approval of the sale points to a specific provision of section 363 as authorizing the Sale Order's asset

---

[25]    It also appears to violate the First Lien Lenders' Bankruptcy Code rights, as oversecured creditors, to accrued interest pending satisfaction of their claim in a manner consistent with their contractual and statutory rights.  See  11 U.S.C.A §  506(b) (West 2005).  Section 506(b) of the Bankruptcy Code provides that, "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose.  I d.  The Bankruptcy Court determined, on the basis of the auction results, that the value of the Debtors' assets (and of the transaction proceeds in which it granted the First Lien Lenders a replacement lien) exceeded the First Lien Lenders' collective secured claim by $95 million.  (Sale Order ¶ Q.)

distribution claim, satisfaction and lien termination features. Rather, the Bankruptcy Court's June 29, 2005, remarks and the Sale Order allude, in justifying the approval of the Order, to the adequate protection and contract provisions discussed above, the Aretex/Icahn Group's insistence on direct distributions in respect of First and Second Lien Debt as a feature of the transaction, and the Bankruptcy Court's view that there was no other more valuable viable transaction.

Nothing in the language of the relevant subsections of Bankruptcy Code Section 363, however, provides the Bankruptcy Court with authority to impair the claim satisfaction rights of objecting creditors or to eliminate the replacement liens granted by the court in connection with the section 363(b) sale. The relevant provisions of section 363 that authorize the court to alter creditors' lien rights do so only in the context of freeing the transferred property from such interests (363(f)) and providing adequate protection in respect of the transfer free and clear (363(e)). Nor do the Bankruptcy Court's remarks and findings concerning the centrality of the distribution provisions (and their concomitant implications for practical control of the post-transaction operating entity) to the Aretex/Icahn Group and the Bankruptcy Court's references to an alternative scenario consisting of forced liquidation or piecemeal asset sales supply the requisite link to authority for the challenged Sale Order provisions. The fact that a transaction including a section 363(b) sale of assets may ultimately be in the best economic interests of a debtor's various constituencies does not authorize the court to ignore the creditors' rights and procedural requirements of Chapter 11.

Indeed, it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures. Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved under that section. See Clyde Bergemann, Inc. v. The Babcock & Wilcox Co. (In re The Babcock & Wilcox Co.), 250 F.3d 955, 960 (5th Cir. 2001)

("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan."); Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.), 780 F.2d 1223, 1226-28 (5th Cir. 1986) ("When a proposed transaction specifies terms for adopting a reorganization plan, 'the parties and the district court must scale the hurdles erected in Chapter 11.'" (citations omitted) "[A] debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization. . . . [I]f a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's [sic] rights under, for example 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless.  Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan."); Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 939-40 (5th Cir. 1983) (district court did not have authority under section 363(b) to approve transaction that required "significant restructuring of the rights of Braniff creditors," including provisions limiting permissible dispositions of proceeds of sale of all of debtor's assets), reh'g denied, 705 F.2d 450 (5th Cir. 1983); see also Collier's on Bankruptcy ¶ 363.02[4] (15th ed. rev. 2005) ("Attempts to determine plan issues in connection with the [section 363(b)] sale will be improper and should result in a denial of the relief requested.").  The Sale Order, which authorized and directed operating assets as well as the direct distribution to creditors of the consideration paid for those assets and the termination of liens and other interests, clearly constituted an attempt to determine or preempt plan issues in the context of the Section 363(b) sale and was improper to that extent.

     The cases cited by Appellees in which pre-Chapter 11 plan distributions have been

upheld are not to the contrary, as none involved transactions in derogation of affected creditors'

interests.  Compare In re Realty Assocs. Sec. Corp., 58 F. Supp. 220, 221-22 (E.D.N.Y. 1944) (in case

under Chapter X of former Bankruptcy Act, partial cash principal payment to bondholders permissible

prior to plan being proposed, where company's liquid assets substantially exceeded what was

necessary for continuance of debtor's business, "there is no reason why a distribution should not be

made at this time," and distribution could be made "without in any manner impairing the interest of

the debtor"), and In re Indus. Office Bldg. Corp., 171 F.2d 890, 892-93 (3d Cir. 1949) (case under

Chapter X of former Bankruptcy Act, holding that statute did not preclude "giving creditors the

benefit of their contract rights to the extent that this may be accomplished consistently with the

preservation of the going concern value of the real estate when reorganization is contemplated" and

objecting parties "failed to show either that the payment made or the payment contemplated would

render reorganization impractical or not feasible."), with In re San Jacinto Glass Indus., Inc., 93 B.R.

934, 942-43 (Bankr. S.D. Tex. 1988) (finding no reason shown to delay secured creditor's receipt of

proceeds of sale of asset in which it has undisputed priority claim and noting that disbursement of

funds to secured creditor would not "materially dictate the terms of the debtor's reorganization nor

otherwise endanger the creditor protections available to" the objecting unsecured creditor), and In re

Conroe Forge & Mfg. Corp., 82 B.R. 781, 785 (Bankr. W.D. Pa. 1988) (denying application for

creditor distribution in advance of liquidating Chapter 11 plan on grounds that, inter alia, "if

distribution of assets occurs before confirmation, there will exist no means by which a plan may be

implemented. . . [thus violating] § 1123(a)(5) [of the Bankruptcy Code]").

   Appellees also cite Coleman Oil Co., Inc. v. Circle K Corp. (In re the Circle K Corp.),

127 F.3d 904, 910-11 (9th Cir. 1997) for the proposition that "it is well accepted that Bankruptcy

Courts have the power to fairly and equitably modify contractual rights."  (Br. of

Appellees/Cross-Appellants at 47.)  Suffice it to note that the Bankruptcy Code authority cited by the

Ninth Circuit for such modification in that case consisted of section 365(a)'s provisions for rejecting

an executory contract and curing defaults, and the effect of the automatic stay under section 362,

neither of which provisions is meaningfully at issue on this appeal.[26]  In re Real Pro Fin. Servs., Inc.,

120 B.R. 216 (Bankr. M.D. Fla. 1990), cited by Appellees for the same proposition, denied a secured

creditor relief from the automatic stay on the grounds that the creditor's rights could be impaired

through invocation of the Chapter 11 "cramdown" provisions of section 1129 of the Bankruptcy Code

in the context of plan confirmation.  These authorities add no weight to Appellees' argument that the

impairment, at issue here, of the Objecting First Lien Lenders' security and contractual rights was

authorized by section 363.

*Bankruptcy Code Section 105*

The Sale Order also relies on Bankruptcy Code section 105; this Code provision is

similarly ineffective to validate the challenged provisions.  Section 105(a), which grants authority "to

issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy

Code],"[27] is a powerful tool in connection with the reorganization of debtors and the realization of

fresh starts, but is not infinitely flexible.  In particular, section 105(a) does not permit bankruptcy

courts to issue orders that are inconsistent with Bankruptcy Code requirements.  Barbieri v. RAJ

---

[26]   In an oral decision denying Appellants' application for a stay pending this appeal, the
Bankruptcy Court remarked that the Sale Order's provision for distribution of
Securities to the Second Lien Lenders could be deemed a species of relief from the
automatic stay.  (7/22 Tr. at 14.)  That rationale, like the Bankruptcy Court's adequate
protection theory, ignores the Sale Order's fundamental alterations of the superior
rights of First Lien Creditors, and thus fails to identify the necessary authority for the
transaction.  The Sale Order invokes the authority of section 365 only in connection
with contracts being assumed by the Aretex/Icahn entities.

[27]   11 U.S.C.A. § 105(a) (West 2005).

Acquisition Corp. (In re Barbieri), 199 F.3d 616, 620-21 (2d Cir. 1999) ("'[T]he equitable powers

emanating from § 105(a) . . . are not a license for a court to disregard the clear language and meaning

of the bankruptcy statutes and rules.'" (quoting Official Comm. of Equity Sec. Holders v. Mabey, 832

F.2d 299, 302 (4th Cir. 1987)); see also Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d

392, 403 (1st Cir. 2002) ("[S]ection 105(a) does not provide bankruptcy courts with a roving writ,

much less a free hand.  The authority bestowed thereunder may be invoked only if, and to the extent

that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right

conferred elsewhere in the Bankruptcy Code.").

        Section 105 does not authorize bankruptcy courts to ignore Code requirements simply

because they might constitute barriers to otherwise desirable outcomes.  The Supreme Court made

clear the limits of the courts' general equitable powers in bankruptcy in this regard in Norwest Bank

Worthington v. Ahlers, 485 U.S. 197 (1988), a decision in which it rejected an attempt to avoid the

strictures of Bankruptcy Code section 1129(b)'s "absolute priority" rule in connection with a

confirmation of a plan that the circuit court believed would have produced a better outcome for the

objecting creditors than liquidation:

> The short answer to these arguments is that whatever equitable powers remain in the
> bankruptcy courts must and can only be exercised within the confines of the
> Bankruptcy Code. . . . [T]he Code provides that it is up to the creditors – and not the
> courts – to accept or reject a reorganization plan which fails to provide them adequate
> protection or fails to honor the absolute priority rule. *** The Court of Appeals may
> well have believed that petitioners or other unsecured creditors would be better off if
> respondents' reorganization plan was confirmed.  But that determination is for the
> creditors to make in the manner specified by the Code.

485 U.S. at 206-07 (citations omitted); see also United States v. Sutton, 786 F.2d 1305, 1308 (5th Cir.

1986) ("While the bankruptcy courts have fashioned relief under Section 105(a) in a variety of

situations, the powers granted by that statute may be exercised only in a manner consistent with the

provisions of the Bankruptcy Code. . . . That statue does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, . . . or constitute a roving commission to do equity." (footnotes omitted)).

This is a Chapter 11 case. Chapter 11 authorizes the alteration of objecting creditors' rights through the plan confirmation process. As the Bankruptcy Court acknowledged in its June 29, 2005, oral opinion, the First Lien Lenders' insistence on cash satisfaction of their claim would have rendered the Debtors unable to confirm consensually a plan incorporating the challenged features of the Aretex/Icahn transaction. (6/29 Tr. at 217.) The Bankruptcy Court's utilization of sections 363(b) and 105(a) to overcome Appellants' anticipated objections to an attempt to cram down an equity-based plan of reorganization must be rejected.

Remedy

In light of the closing of the sale, the mooting of Appellants' challenges to the sale itself and the direct distribution of the Parent Shares to the consenting First Lien Lenders (i.e., Aretex and its affiliates), the Court has considered whether there are any measures that could be taken, consistent with the Stay Order and Bankruptcy Code requirements, to resolve the Objecting First Lien Lenders' legal arguments and claims, and finds that there are. The Stay Order has kept in limbo the Sale Order's mechanisms for claim satisfaction and for the lien releases attendant upon such claim satisfaction. The Objecting First Lien Lenders explained at oral argument that they seek, in the first instance, continuation of their liens but that they ultimately seek cash satisfaction of their claims. They also represented that they treat as collateral and will give up for sale, toward such satisfaction, the Securities that were distributed directly to them. (Tr. of Sept. 20, 2005 oral argument, at 45-46.) It thus appears that it may be possible to realize sufficient cash from the sale of those Securities, the

Securities held in escrow pursuant to the Sale Order, and/or undistributed Excluded Assets (a term defined in the Sale Order) to satisfy in full the claims of the objecting creditors, whereupon any remaining Securities or other proceeds could be distributed to the Second Lien Lenders substantially in accordance with the Sale Order. This matter will be remanded to the Bankruptcy Court for further proceedings consistent with this Opinion, including resolution of the outstanding Objecting First Lien Lender claim and lien satisfaction issues. The Subscription Rights held in escrow pursuant to the Sale Order will remain in escrow pending further order of the Bankruptcy Court.

## CONCLUSION

For the foregoing reasons, the Court will enter an order modifying the Sale Order by reversing the Bankruptcy Court's determinations that the Sale Order provisions for the in-kind satisfaction of the claims of Objecting First Lien Lenders and the distribution of excess Securities to Second Lien Lenders over the senior creditors' objections are permissible under the Intercreditor Agreement, Credit Agreement and/or Sections 361, 363 and 105(a) of the Bankruptcy Code. The provisions for such claim satisfaction and the release of liens in connection therewith will be vacated insofar as they apply to the Objecting First Lien Lenders, and the matter will be remanded to the Bankruptcy Court for further proceedings consistent with this Opinion. The Subscription Rights currently held in escrow pursuant to the Stay Order will continue so to be held pending further order of the Bankruptcy Court.

Dated: New York, New York
      November 16, 2005

LAURA TAYLOR SWAIN<br>
United States District Judge